We don't need our... You can hear me, right? Okay. We must have gotten new microphone thingies. Anyway, we have an interesting docket today. I want you to know that we will have read your briefs and record excerpts. We have not necessarily gotten into the records, so we appreciate your giving us record citations when those are appropriate and also we appreciate your adhering to our time limits, which are gauged, as you know, with a yellow light for two minutes and a red light that says, please stop talking unless you're answering a question from the court. First case of the morning is number 17, 50217, U.S. Energy Development Corporation v. CL III Funding Holding Company. We'll hear from Mr. Taylor. May it please the Court. Good morning. Mark Taylor here on behalf of the appellant, U.S. Energy Development Corporation. You want to speak up a little bit, please? Yes. May it please the Court. Mark Taylor for the appellant, U.S. Energy Development Corporation. Usually that's not a problem for me, speaking up. Your Honors, there are two issues that are presented in this appeal. First is whether or not the courts below, and this is an appeal from the bankruptcy court to the district court to this court, whether the courts below erred in holding that the appellant was not a prevailing party in an action to enforce a financial obligation under a joint operating agreement. The second is whether or not the courts below erred in holding that the appellant had no valid lien on assets purchased by the appellee, CL III, and were not assumed liens or otherwise senior secured claims for which a lien can attach to assets purchased by Castle Lake, CL III, in the underlying bankruptcy proceeding. May I ask, as a preliminary matter, how much you're claiming in attorney's fees at this point? It's capped at $500,000 percent to our agreement with CL III. There was an agreement in the underlying case that said that if we were entitled to recover attorney's fees, that those would be capped at $500,000 as the amount that we could seek to recover against the assets that were acquired by an appellee in this case. I noticed that there was a statement in the district court's record that we were seeking $11,400,000 in the proof of claim for attorney's fees. That was actually the total proof of claim and not the attorney's fees. Oh, good. Okay. Judge Graves needs a ballpoint pen. You can go ahead. Okay. First of all, with respect to the issue of whether or not my client, U.S. Energy, was a prevailing party entitled to attorney's fees, well, the court below interpreted a provision of the joint operating agreement that reads that essentially says that if you are a prevailing party, this is Section 7d.5 of the joint operating agreement, and that's at Record 1551, in the event that any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, cost of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure. Well, the courts below interpreted financial obligation to mean was there had to be a monetary payment. And Judge Mott in the bankruptcy court held so because he interpreted, used Black's law definition of financial interest and the Merriam-Webster dictionary definition of financial to mean there had to be a payment. There is no requirement in that provision, nor otherwise in the joint operating agreement, that there be a payment, that financial obligation means payment. Well, that's certainly true. But you could have said that any party is required, let's see, in the event any party is required to bring legal proceedings to enforce any obligation, you get to shift attorney's fees. I think that's correct, Your Honor. And I would agree with you that the parties could have put that in there. They didn't. And so what we're left here is trying to interpret what their intent was based upon the four corners of the document. But all of your lawsuits were directed at changing the operating, the operator. Well, and that goes to the issue. They were. They were directed at changing the operator based upon the prepetition default of the existing operator, which had become financially insolvent well before the bankruptcy was filed, so that provision was enforceable and not an ipso facto clause, or an unenforceable ipso facto clause. But, Your Honor, the definition of who is a prevailing party, if you look at the case law, doesn't require that there be monetary judgment. The case law in Texas and in the U.S. Supreme Court is very clear. And we cited those in our briefs, the Intercontinental Group Partnership case from the Texas Supreme Court, the Wibbenmeyer case from the Texas Court of Appeals, and the U.S. Supreme Court's decision in Buckhannon versus the State of West Virginia. And those all say that you are considered a prevailing party if you alter the legal rights of the parties, and that can include equitable relief. It can include a consent judgment. Tell me what would not be a suit for a financial obligation. Well, in the context of this contract. Sure. In this contract, I think a suit — maybe I can answer it this way. A suit to enforce a financial obligation could include any number of things. It could include to require payment. It could include, which the courts below held, and I agree that would be a financial obligation. It could be to enforce the operator's obligations to seek financial payments from other parties and take the actions that they're required to take as an operator and make sure that the working interest owners are funding their joint interest billings, which did not occur in this case. It could be to keep up with your accounting obligations and reporting obligations under an agreement. All of those are financial obligations, just as, although this is not a credit agreement, a covenant, a financial covenant in a credit agreement would be a financial obligation. There are lots of things that are financial obligations of parties that have to keep up with their covenants, that have to enforce payments to be received from other parties, that have to properly keep books and records, that have to maintain their own financial status, that don't involve payments. Yes, but there are a lot of obligations of an operator of an oil and gas property that go way beyond financial. I think that's correct, and I would agree with you on that. There are obligations. So when you sue to change operators, you're covering a lot more territory than just financial obligations. Well, you have to, yes, sort of, Your Honor, and let me point you to what was actually occurring in this case. In this case, as the record shows and is not in dispute, the operator in this case was an affiliate of the working interest owner, of one of the working interest owners. Right. My client was a working interest owner. They were an affiliate of the other working interest owner. That working interest owner was not funding its joint interest billings. The operator was using the funds we were receiving to pay them willy-nilly to whoever they wanted to pay them to. But you could have sued that limited partner directly, could you not? We could have sued the limited partner directly to require them to pay. Right. But fundamentally, unless we changed who the operator was under the operating agreement, who controls the accounting, who controls the bookkeeping, who controls the default provisions, who controls the right to make the other parties pay their share of the bills, nothing was going to change. These folks were tied at the hip, and unless the operator was removed, then nothing was going to happen in the case because they were simply not going to pay their joint interest billings. What did happen is once the bankruptcy was filed and once we took our actions, we did, if a payment obligation is required, we did require that a, or enforce our obligations to require that a payment be made. After the bankruptcy was filed, after we took over the operatorship, the other working interest owner, the debtor LP as referred to by the courts below, did in their share of the operating expenses under the joint operating agreement and did fund the completion cost for six wells while we were the operator. We enforced that payment obligation. Now, if CL-3 is going to say, well, that's because we funded that under the debtor in possession loan during the course of the bankruptcy proceeding, but that's the way it was being funded before the bankruptcy was filed. It just wasn't getting paid. In your reading, which of these obligations would not trigger an obligation to pay attorney's fees? Which would not be a financial obligation? Part of the difficulty I have with your argument is that on its face it looks like you can fund the fee shifting of counsel fees to situations in which you are directly forcing an obligation to pay money as distinguished from other obligations. In other words, you can anticipate a whole range of disputes in a leasing operation like this. And my question is, okay, you say it means more than that. These other obligations that did not have a specific obligation to pay money, but nonetheless certainly entail a great deal of money and consequences, should be reached. Where, if we accept your principle, how far would that have gone in this agreement? Well, I think that you can look at obligations under the joint. I'm sorry. I assume, my predicate is that the parties, by having any kind of precise language, did not intend to create attorney fee obligations for everything. I think that's right. And I think, unfortunately, the language is in. Except in your reading, where do you cabinet? Well, I think there would be an obligation, for example, under the joint operating agreement where the operator is going out to identify well opportunities and locate places that might be appropriate for drilling within the lease. And that would not be, I think, probably a financial obligation. That would be a covenant of the operator to go out and locate the places that look like good drilling sites to present to the working interest owners as opportunities for drilling under the joint operating agreement. That would be an example. And I'm not saying there aren't others under the JOA. It's a long document and a somewhat imprecise document. I used the example of a credit agreement earlier. This is not a credit agreement. The courts have read a number of these over the years, I'm sure, and they're somewhat convoluted in the way they're put together. But there are fundamentally many financial obligations under the joint operating agreement, as I've discussed, that do not involve the actual enforcement of making somebody pay some money under the joint operating agreement. And they could have used the language, a financial obligation to require payment of money. In fact, the district court actually used that language, Judge Yackel did in his opinion, and that's simply not what the provision on attorney's fees says that I just read to you. You can read it for yourself. It specifically just says enforce a financial obligation, not a financial obligation to require a payment. Yes, and reading the briefs, pretty much as Judge Jones did, that this is the fight over the operating agreement itself, who's going to be the operator. That arrangement ongoing was not working. Bills weren't getting paid. I don't know what the causes were, but there was failure there. And you had an ongoing valuable asset that needed to be produced. And so the fight that you wanted to get into, that you were trying to get into, would become the operating agreement. Operator, that is part of a sale of the asset itself. So the whole fight just seemed to be about getting the operator. Well, Your Honor, there were actually two steps to that. The first was who was going to be the operator during the pendency of the bankruptcy case. And the reason we got there again is because the financial obligations were not being enforced. The fight is to replace the operating agreement, and it's about everything. It's incidental to that. But once you're going to remove the operator, then you're talking about really changing fundamentally the players. It did fundamentally change the players. And certainly we were talking about that, and I agree with you, Your Honor. But again, there were two parts. One was how U.S. Energy Development Corporation got to be the operator and why it needed to. And it's because the existing operator was not enforcing the financial obligations of its affiliate. Then the second issue was how was that going to continue post-bankruptcy. It's a failure of the operator, among other things, to manage his accounts and he's creating liabilities up the lines and lends and so forth. But that doesn't mean that this suit is to enforce a financial obligation. It is a suit really for failure of other parties to do what they should have done. And I think that depends on how you interpret it. I'm sorry, Your Honor. It's not a financial obligation running to your client. It's an obligation that has economic consequences. Well, I think it is a financial obligation. Let me explain why. It's a financial obligation because the operator has the financial obligation to ensure that everything that needs to be paid is getting paid. To me, that is a financial obligation. And by not requiring their affiliate to make the payments that were necessary under the joint operating agreement, they were not fulfilling their financial obligations. We had to remove them as operator to make sure those financial obligations that they were collecting from the party that owed it, they were paying the bills to the parties that owed the bills, and just so the Court's aware, it was $11.4 million that hadn't been paid to the service providers. That was the basis of our proof of claim, and that's the amount that was outstanding. That's what we had to do. We had to enforce the financial obligation of the operator to collect the money and the financial obligation of the operator to pay money going out to the parties that owed money, including the $1.9 million that we interpled into the Court and ensured was distributed to the right parties. I don't believe your brief cited the, I mean, it referred to your state court complaint and your proceeding in the bankruptcy court, and I don't think we can leave your interpleader aside, but did any of your complaints fortify this argument that you're making that this was mostly a financial obligation that you were suing about as opposed to total replacement of the operator? The state court proceeding, Your Honor, specifically sought recovery of damages. We did not do so in the adversary in bankruptcy because we wanted to focus on removing the operator and because that was really something that we filed in our proof of claim and it was a claim issue that would be pursued during the case as part of the claims allowance and disallowance process. But the relief you got in the state court proceeding was a temporary restraining order. That's correct. What happened is the TRO got issued, and a few days after the TRO was issued, the debtors filed bankruptcy. And once they filed bankruptcy, we then changed it to bringing the adversary proceeding in the bankruptcy court. All right. Thank you, Your Honor. All right. You have time for rebuttal. Mr. Green. May it please the Court. Kenneth Green for CL3 Funding Holding Company, LLC. In this case, the issue is whether or not USED is entitled to a secured claim in the bankruptcy case, not whether or not they are entitled to any claim for their recovery fees against the debtor. So as a result of that, they must fit their claim within the specific provision under the joint operating agreement, which would create a secured claim. There are several requirements under the JOA in order for them to get there. And when you break it down that way, the logical place, I believe, to start is with the fact that USED must bring, or in other words, file or initiate a legal proceeding to enforce a financial obligation. The reality of what happened in this case was in December 2014, when USED initiated their first lawsuit, which was the state court lawsuit. Both Debtor LLC, the operator, had a financial default at that time under the JOA. The operator had failed to pay vendors, oilfield service companies, and drilling companies for amounts that were due. Debtor LP, the working interest owner, also was in payment default under the JOA for joint interest billing amounts that were due to the operator. This will illustrate why, among other reasons, USED's claim fails. So USED filed their lawsuit. They did not seek to enforce the financial obligation, which would have been forcing the default to have been cured, by either entity. USED didn't even seek an order requiring the operator to pay the vendors. They didn't even seek an order requiring the working interest owner to pay the operator. Instead, what they sought and what they in fact obtained in a temporary restraining order was a declaratory judgment, a declaratory judgment that would serve as a recognition that under the joint operating agreement, WBH, or Debtor LLC, was deemed to have resigned and USED was the successor operator. They didn't even really seek the removal. They sought the recognition of the removal in the temporary restraining order. So what they sought, and Judge Higginbotham identified it, was the whole fight was about who was going to serve as the operator. It's really the opposite of enforcing a financial obligation. They wanted Debtor LLC out. They didn't want an order that said Debtor LLC had to comply with its financial obligations as the operator. They also did not seek an order enforcing any financial obligation on the part of Debtor LP. The reason why that distinction becomes so important, and the bankruptcy court does a good job of thoroughly analyzing this, there is no cross-collateralization. So the claim and the lien and the assets have to all match up. Quite frankly, the bankruptcy court's finding a fact, which was not challenged, that no assets owned by Debtor LLC, the operator, had any value, that's really dispositive of whether there can be a secured claim for attorney's fees. That's in ROA 1517 footnote 22 on page 34. Debtor LP, of course, the working interest owner, it did have assets. So there's collateral there, but there's no valid claim there. If there's no valid claim, there's no valid lien. Now, I went through two of the criteria under the JOA, that USED must bring the legal proceeding and that the legal proceeding must be one to enforce a financial obligation. Then there's also the requirement that USED must be the prevailing party in enforcing that financial obligation. Let me ask you a question, though. Didn't I have the impression that USED supported your client coming in and taking over the operating interest? Is that right? It was the opposite. My client, CL3, agreed that USED would serve as the operator. All right. Well, who's the operator now? USED is the operator. Oh, okay. For some reason, I thought that CL3 had come in and done that. No. In fact, USED is an E&P company, and my client is a financial services company, and we own a non-operating interest, but we're not an operating E&P company. So you have four separate proceedings at issue, four separate legal proceedings at issue, only two of which were brought by USED in seeking relief against debtor LLC, state court action and then the adversary proceeding. What happens to the unpaid creditors, the creditors unpaid by the operator? Those creditors have general unsecured claims in the WBH bankruptcy case, and there was a creditor's trust formed for their benefit, and that's how the bankruptcy case ended. But you paid off the material men. You paid off the lien holders. No? Or settled with the material men lien holders? There was a settlement with a group of the lien holders that Castle Lake sued in an adversary proceeding for a declaratory judgment with respect to the validity and priority of liens against the debtor LP working interests. In operation with USED as the operator, you're going to have to deal with those suppliers, those people in the lien holders whether they're secured or not, those other people to whom the obligations had been generated by the prior operator. I mean, otherwise you're going to have to be tied up in liens, et cetera. So my point, my suggestion to you is getting at the question of the argument that enforcing a financial obligation, that the operative effect here was to cause payment to those unpaid persons. Well, so all those liens have been dealt with. I'm not suggesting that necessarily meets the terms of the agreement. I'm just trying to get factually what happened. Sure, sure. So here's what happened. So Castle Lake sued all of the vendors who asserted oil and gas liens under Chapter 56 of the Texas Property Code in an adversary proceeding, and then there was a mediated settlement in that adversary proceeding. There was a finite sum of money that was contributed by Castle Lake, and that money was then paid out to the lien holders. There was a sale of the property free and clear of their liens, and then there was a subsequent Chapter 11 plan that was confirmed. So the vendors, aside from the payment that they received under the settlement, they have now an unsecured claim back against the debtor for the remainder of their trade account that wasn't paid. Now, so we start with the two proceedings that I mentioned that were brought against debtor LLC, and the relief that was sought was the removal of the operator. And we know that all that was, the most that was ever obtained was preliminary injunctive relief. But as I said, I think that the dispositive issue on those two is that even if you assumed everything else in USED's favor, you have a finding by the bankruptcy court that there's no value in any asset owned by debtor LLC. So now we move to the third proceeding. The third proceeding was the USED interpleader action. And again, this is an example of something that is the opposite of what they would have to be bringing under the JOA to have a secured claim for their attorney's fees. And here's what I mean. That interpleader action was not a suit to enforce a financial obligation of either of the WBH debtors. That was USED coming into court saying, we owe joint interest billings that we have not paid, but we received these mineral subcontractor lien notices under Chapter 56. Therefore, we're going to interplead this money so that we don't face double liability in the form of, one, a liability to the operator for unpaid joint interest billings, and two, direct liability to the vendors on account of their statutory mineral subcontractor liens. The issue dealt with their own financial obligation, not either of the WBH entities' financial obligation. And then you also have the bankruptcy case itself. And the starting point there is that that was not a proceeding that USED brought. This was a voluntary bankruptcy case, not an involuntary that was initiated by USED as a petitioning creditor. So they failed the first requirement of bringing the legal proceeding. Even if you want to look within the bankruptcy and look at certain contested matters, USED doesn't fit within the parameters there either, or stated another way, those contested matters don't fit within the requirements of the joint operating agreement for a secured claim. USED talks about the payment that was made post-bankruptcy for completion costs on the Lewis Stewart Wells. That is an apples and oranges difference from the pre-petition amounts that were in default for unpaid joint interest billings. When you prepay an AFE, or authorization for expenditure, you're making an election to participate. By electing to participate, you have to pay your share. In fact, you have to pay it in advance. But you can also elect not to participate and just go non-consent. And that doesn't create a default. So it's a completely different scenario than what I described at the beginning where you had an amount that was in default, that was owed for unpaid joint interest billings, and had USED chosen to do so, they could have brought a legal proceeding to enforce that financial obligation. Again, USED... So your point is, and you made it very explicit, I think, that none of these lawsuits were essentially for financial obligations. They were for other purposes, right? Absolutely. But, I mean, it is also the case that money is the root of all evil, and therefore they would not have been doing this had there not been underlying difficulties with financial obligations, right? Not a lot of money. Presumably that's a correct statement. Had DEDOR LLC, the operator, not been... Had they been paying their vendors and had they not been in default under their obligations? I mean, it wasn't a deal that they were incompetent in their seismic surveys or their choice of properties on which to drill or their choice of drilling contractor or subs or whatever. It was that they weren't paying people. The money was going somewhere else or the prices were too low or something. Right. That was the driving force behind the initiation of... So that's basically what their argument is. It's all about money and, therefore, financial obligations. Well, the standard under the JOA is not what a party's underlying motivation may be to bring the lawsuit. The standard is whether they bring legal proceedings to enforce a financial obligation and that they are the prevailing party in doing that. So, in this case, there were only two separate legal proceedings. If we exclude the interpleader action and we exclude the bankruptcy case itself, you just have the two lawsuits that were brought by USED. Really, it's functionally one. The state court lawsuit lasted a matter of days and then it was refiled as an adversary proceeding and they sought the same relief. And in that case, their motivation may have been that DEDOR LLC had failed to pay vendors and that's why they were bringing the suit, but the relief they sought was not to enforce a financial obligation. It was for the removal of DEDOR LLC as the operator and the insertion of USED as the recognized operator in their place. So it is quite literally the opposite of an order that would have said, the court hereby finds, determines, and orders that DEDOR LLC comply with its financial obligations and pay vendors amounts that are owed under the joint operating agreement. If it had been that, would you have owed attorney's fees? If the order had said that, would they be entitled to their attorney's fees? Is that the question? The answer is yes, they would have been entitled to their attorney's fees. If the answer to that is yes, then you're conceding that the financial obligation may not run to you, but that if you're filing a lawsuit, the payment of a financial obligation owed to others. But that's not all. It's not enough. It may not be all, but that's one of the threshold questions here. Right. Now, understood, the obligation, the financial obligation can run to others, but in order for their claim to be a secured claim under the JOA, they would also have to own assets subject to that lien. And in this case, you have the bankruptcy court made a clear finding that DEDOR LLC did not own any assets of value, so there would be no collateral there to secure a claim, to make it a secured claim. So just because there would be a claim doesn't mean it's a secured claim under the JOA, under the facts here. DEDOR LLC was functionally the contract operator, did not own the working interests. Just under the hypothetical, if USED had obtained a judgment to enforce a financial obligation against DEDOR LLC, they still would have to show that DEDOR LLC actually owned interests under the JOA that a lien could attach to. That's the problem and why, if you go down that path, their claim still doesn't work. You still don't get to a point where they're entitled to a valid secured claim. Again, they may have an unsecured claim. That's not Castle Lake's fight. They're free to assert whatever unsecured claim they want under any contract theory or statutory theory. We're only concerned about this narrow issue. What are their rights with respect to a secured claim under Section 506 of the Bankruptcy Code, which necessarily takes you to having to fit within the parameters of the joint operating agreement and having to show that the DEDOR entity that they have a claim against owns the collateral that they seek to assert a lien against. They really never sought any relief against DEDOR LP, the working interest owner, the entity that owns the assets that they want to assert a lien against. And, in fact, in the adversary proceeding, their claim that they pled against DEDOR LLC was dismissed under 12B-6 for failure of state of claim. Why was that? Because I believe that the reason was because the primary relief they were seeking was the removal of the operator, which DEDOR LP was not the operator. And, of course, as we talked about, there was a default in payment by DEDOR LP. There was the nonpayment of joint interest billings. But USED didn't even seek an order compelling DEDOR LP to pay those amounts, and they certainly did not obtain an order such that they would be considered a prevailing party against DEDOR LP on that claim. I think we have your argument, unless you've got some point that you've left out. I think I've covered everything. Thank you. Okay. Thank you. Your Honors, I'd like to circle back to a couple of issues that were raised in the primary argument. First of all, to Judge Higginbotham, you had asked about what other duties there are under the JOA that would not be financial obligations. And I think that if you look, I would ask the Court to look at the JOA and specifically page 1542 of the record. That's a part of the JOA that talks about the rights and duties of the operator. There is a specific provision, provision that's Article 5d, that lists what those are, and they include financial and nonfinancial. For example, financial, I would say D2, discharge of joint account obligations, except as otherwise provided, operator shall promptly pay in discharge expenses incurred in the development and operation of the contract area. It goes on. Three, protection from liens. That would be financial. Custody of funds, financial. Access to contract area and records, probably not financial. Filing and furnishing governmental reports, probably not financial. Drilling and testing operations, not financial, the way they're worded because it has to do with advising people when certain things happen under the drilling, like sputting the well. Cost estimates. Insurance may be financial. So there are financial and nonfinancial obligations that are listed specifically under the duties of the operation of the JOA. And we were seeking to enforce, among other things, the financial obligations to make the payments to the people that were owed money and to get the money that you were owed from the working interest. What's your answer to his argument that against the operator, the operator, you have a possible claim for financial obligations, but you have no assets? He has no assets. He filed bankruptcy. That's actually incorrect, Your Honor. And against the limited partner, they have assets, but you don't have a lien. You don't have a right to a lien on their claim. Two responses to that, Your Honor. First is if you actually look at the sale order, and that is record 2366. At page 23 through 25, it says that the assets that are being conveyed to the appellee include the assets of both the debtor LP and the debtor LLC. And then if you look at the exhibits that begin on the record, page 2423, there are a number of assets that are in the name of debtor LP and debtor, both debtor LP and debtor LLC, that are being conveyed to Castle Lake. So I'm not sure where counsel is coming up with the idea that there were no assets. Well, the assets can mean the desk in the secretary's office. That doesn't mean that they have an equity in any of the ownership of the properties, which is the real asset. Well, Your Honor, there certainly would be those kind of assets. But what I'm talking about, if you read the list of assets that were conveyed, they include leasehold interest, interest in wells, and things of that nature. And we're not talking about desk and pencils. Well, I know they can include them, but that doesn't – I assume that what Judge Mott was getting at was no equity in the asset. Well, Your Honor, Judge Mott made no finding on the value of those assets. There was no evidence that was presented that those assets lacked value. And our lien pursuant to our agreement with Castle Lake was a senior-secured lien that attached to everything they got so long as it related to our lien rights under the joint operating agreement. And there was no evidence presented that those assets – Wouldn't we have to remand then if we thought you had – if we thought the judge was wrong on the contract interpretation, wouldn't we have to remand to find out whether you had an enforceable lien because if there were assets, there's equity in any of this? Yes, Your Honor. I believe that that could be something the court would have to do. And Judge Graves, I wanted to address your question about what we sought in the adversary proceeding. If you look at the complaint that was filed, and specifically Record 2268, we did sue for breach of contract against the debtor LLC and sought damages. And then, interestingly, if you look at Judge Mott's findings that he made that were orally announced in connection with a preliminary injunction, those are, for example, in Record 2303, Judge Mott found that the debtor LLC had failed to fund its share of expenses under the joint operating agreement by over $11 million. Also found that the debtor LLC never made a demand request or cash call to the debtor LP to pay its unpaid share of expenses under the JOA. He made findings that the LP had not funded his expenses and that the LLC had not made demand for them, among other findings. And so there were specific findings on the failure to comply with a financial obligation. And I see my time is out. So thank you for your time today, Your Honors. Okay. Thanks a lot.